Opinion delivered May 25, 1886.

[No. 3851.]

## JOHN LEGGETT *v.* THE STATE.

1. MURDER—MANSLAUGHTER—CHARGE OF THE COURT.—See the opinion *in extenso* and the statement of the case for evidence in a murder case, *held* to demand of the trial court a charge upon the law of manslaughter, whether asked or not.
2. SAME—INSANITY.—See the statement of the case for a special charge upon the defense of insanity, which, in view of the evidence on the trial, should have been given.

APPEAL from the District Court of Dallas.   Tried below before the Hon. G. N. Aldredge.

The appellant in this case was charged by indictment with the murder of John Andrews, in Dallas county, Texas, on the fourth day of July, 1885.   His trial resulted in his conviction of murder in the second degree, his punishment being assessed at a term of five years in the penitentiary.

J. S. Rawlings was the first witness for the State.   He testified as follows:   "I live in Dallas county, and have lived there since 1848.   I have lived in Hutchings for the last two years.   I knew John Andrews.   He is dead.   His death was caused by a pistol shot.   I saw him shot.   John Leggett shot him in this, Dallas county, on the fourth day of July, 1885.   I saw the defendant, John Leggett, ride up north out of the base ball grounds, hitch his horse, and go down into town.   Reese Clinton came out of his shop, and I heard him call John Leggett and say that there was a row down there.   John Leggett came out a moment after, went to his horse, got on him, and got his pistol out of his saddle bags.   He then rode to where the negro was and shot him, and

then shot at another man, and rode down into town, where he was arrested. I saw John Andrews, the deceased, standing perfectly still, about the time the defendant threw his pistol down on him. I think the deceased was hit just below the right eye."

Cross-examined, the witness testified as follows: "I saw the defendant the first time about two o'clock. When we went out to the play ground to play base ball, he was either sitting on his horse or was tying his horse. I saw him again about five o'clock, coming from the black smith or wood shop. He was not on the ground when Reese Clinton was calling out that there was a row up. I was not present when the defendant was arrested. I think I was one hundred or one hundred and fifty yards from the defendant when he came out of the shop. The defendant rode his horse in a lope. When on his horse he was flourishing one hand, and I suppose was using his other hand with his bridle. I do not know whether I saw his left or other hand or not. He flourished both of his hands while walking to his horse. Then he got on his horse. After he got on his horse, and as soon as he could get his pistol, he flourished his right hand. He had gone about twenty yards when he began flourishing his hand. He had something in each hand when he came out of the shop. I have no ill feeling in this case, so far as I know. I have not ridden over the county to get some one to testify as I would. I did not see Mr. Buchanan about his testimony, nor did I tell Mr. Clint that I would assist him in getting a jury."

Mr. Wilhite was the next witness for the State. He testified that he was on the base ball ground at Hutchings when the deceased was killed by the defendant on July 4, 1885. Defendant was going towards his horse when witness first saw him. He appeared to be angry. He mounted his horse, rode over the ground, and finally to the point where deceased was standing, and shot the deceased. Witness first noticed Andrews when he fell. He died almost instantly.

Cross-examined, the witness stated that he was standing about thirty yards from the base ball grounds at the time of the shooting. Defendant's horse was then hitched about thirty yards from witness. Defendant was about one hundred yards from witness when witness first saw him, and about an equal distance from his horse. After mounting the horse, the defendant rode pretty rapidly over the ball ground. Witness could not say that he went over it but once. Witness could not say that the de-

fendant described a circle in riding over the ball ground. He first fired his pistol into the air. He then shot Andrews, and then fired a shot into the ground, and rode off towards the store. Witness was not expecting to see him shoot the deceased. When witness first saw defendant, before he got to his horse, he was walking along the prairie, his hands, one of them clutching a knife, hanging at his sides.

Re-examined, witness said that he thought the instrument defendant had in his hand when he first saw him was a chisel. He, defendant, talked loudly, saying something about a d——d negro, which witness did not understand.

On his re-cross-examination, the witness stated that he had no recollection of discussing the tragedy with Rawlings once shortly after it occurred. He talked to Rawlings just before going on the stand, but had little to say on the subject of the killing. The witness, at the time of the shooting, was about one hundred paces from the black smith shop, and between sixty and seventy-five paces from the point where the fatal shot was fired. Defendant was riding in a lope and endeavoring to get some thing out of his saddle pockets when the witness first took particular notice of him. Four shots were fired by the defendant. He killed deceased with his first shot. He then rode in a circle to a man named Glenn, whom he made throw up his hands, and then rode back to the body of the negro. Witness did not see the defendant's pistol until the fatal shot was fired. From the body of the negro the defendant rode to town. When witness reached town, Clinton and others had the defendant down on Appel's porch. The State closed.

Reese Clinton testified, for the defense, that he was with the defendant all day on July 4, 1885, after he, defendant, arrived in the town of Hutchings, until just before the killing of the deceased. The defendant, when he killed the deceased, was, in the opinion of the witness, a raving maniac. He would listen to no one. Witness saw the defendant when he went to and got on his horse. He then rode to the point where he shot the negro, about one hundred yards distant. He then turned almost entirely around and rode towards the base ball grounds. He killed Andrews with his first shot. Witness did not know that he did anything more than halloo while riding toward the ball ground. Witness did not see his hands after he got on his horse. His person was very bloody when he left the black smith shop. Witness tried to prevent the defendant from shooting again after

killing deceased, but failed. Defendant fired again after he killed the negro. He then rode to and into the store, where the witness, aided by defendant's father, pulled the defendant from his horse. One man could ordinarily manage defendant, but two men were insufficient to hold him on that occasion. Defendant was then taken to the depot and kept until ten o'clock. Defendant had one drink of whisky at the shop, the drink being but one swallow. Defendant and the witness then went to the base ball ground. Witness went to the bat and defendant returned to the shop. When witness had struck his first ball, he heard that defendant was raising a row. Witness had known the defendant intimately from his childhood. Defendant, in his childhood, was thrown from his horse and suffered an injury of the head which affected his mind. At times defendant was hopelessly crazy, and at others his mind was passive. He could not be said to be insane at all times, but he had often been too crazy to know either the witness or his own brother. Defendant was not in the least affected by the drink of whisky he took a short while before the killing. The parties present when defendant took the drink of whisky were John Campbell, Shorter, O. B. Clinton, Frank Clinton, E. S. Willoughby, Eli Neal, and Cal Frazier.

Cross-examined, the witness testified that he was a cousin to the defendant. While yet a youth, the defendant was thrown from his horse. His head struck a rock, and injured his mind. Witness knew of nothing else that had ever happened to defendant to impair it. Witness was told that, on the day of, but before, the homicide, the defendant was struck over the head with an engine spoke. The fall from the horse, which resulted in the wound on defendant's head, occurred in 1880. Witness saw the defendant in a crazy fit in 1884. He then acted in a wild, strange manner, becoming violently enraged at his cousin for some slight offense. His mother and brother Jerry were then with him. The witness had never known of the defendant being addicted to drink. Witness did not know a Mr. Parr. Defendant was crazy on July 4, 1885. He cursed, struck at, and called upon every body to help him. He called for boys who were not present. His mother and his brother Jerry came to him after the shooting, but he did not know them. Witness did not go to Hutchings with, but before, the defendant, on the day of the killing. Witness did not know who owned the bottle of whisky from which he and defendant took the drink of

whisky on the day of the killing. · The bottle of whisky, when
first seen by the witness, was in the hands of John Campbell, in
witness's father's black smith shop.   If the whisky belonged to
Eli Neal, witness did not then know it.   Defendant was perfectly
rational at two o'clock, when he and witness went from the ball
ground to the shop.   When, just before the shooting, the defend-
ant left the shop, he walked rapidly to his horse, and cut the
rope with which the animal was tied, mounted his horse, and got
his pistol from his saddle pocket.   Witness was told that defendant
was hit a severe blow over the head with a blunt instrument,
but he neither saw nor examined for wounds on the head.   Wit-
ness saw a cut on the fleshy part of the defendant's right arm,
which he said was done by a negro.   The arm was bloody, and
defendant complained that he was bleeding to death.   Defend-
ant vomited after his arrest.   Witness attributed that vomiting
to sickness of the stomach, resulting from the blow over the
head, and not to the drink of whisky.   Defendant did not go to
sleep at any time on July 4, 1885, after the shooting.   Witness
did not hear defendant tell Doctor Dickey that he would kill him
if he stuck a needle in him.   He did not hear defendant say that
he would kill any body who touched him, and that he intended
to kill every negro except Eli Neal.   Witness was not drunk on
the evening of July 4, 1885.   Eli Neal, Cal Frazier, and the wit-
ness's father were drunk on that evening, and witness's brother
Frank was "happy."

C. S. Camplin testified, for the defense, that he saw the defend-
ant after five o'clock on the evening of July 4, 1885, and re-
mained with him as long as thirty minutes.   The defendant's
actions were those of an insane, and not those of a drunk man.
Witness did not think the defendant was then conscious of his
talk or his actions.

Doctor Potter testified, for the defense, that the defendant was
dangerously ill when he became witness's patient in October,
1881.   He was then suffering from malarial troubles which
threatened the brain, and was wholly unconscious for thirty-six
hours at one time.   Such attacks frequently result in permanent
insanity.   Witness had often seen the defendant after that at-
tack, but was unable to say that his mind was seriously affected.
On one occasion after that attack the witness saw the defendant
when excited and mad.   He was then deranged.   Witness saw
the defendant on the evening of, but after the killing.   He was
then unconscious, and knew no one.   He was then lying down,

and his father and others were using their utmost efforts to hold him. A man who has received a wound capable of making such a scar as the defendant had on his head was liable at any time to become deranged under excitement. Excitement would be likely to cause a rush of blood to the head, producing insanity. A blow on the head severe enough to knock down a man wounded on the head, as the defendant had evidently been, was sufficient, under ordinary circumstances, to produce that degree of excitement sufficient to produce insanity. A very small amount of stimulant taken by a person so wounded would likely produce insanity. A person whose condition of mind was normal might, if stricken on the head, be not affected, but might be rendered instantly insane if the same blow were struck just after he had taken a stimulant. Such a blow might produce insanity without a stimulant having been taken, but was more likely to do so after a stimulant had been taken.

Cross-examined, witness said that he could not testify positively that he had ever seen the defendant insane except during the thirty-six hours of unconsciousness which attended his attack of typho-malarial fever. Typho-malarial fever was frequently attended by deliriousness, without reference to the temperament of the patient. Witness did not know the defendant sufficiently well in 1881 to be able to tell his general condition of mental health. The witness could not say how the defendant's mind had been affected since his attack in 1881. Some time (perhaps a year) after defendant's recovery from his attack in 1881, witness saw the defendant between Lisbon and Hutchings, in apparently a terrible condition of mind. He was violently excited and mad, and was resisting the efforts of some parties to hold him. It was possible that, on that occasion, he was in liquor, and was quarreling. Witness did not claim to be an insanity expert. Deceased was sixty-five or more years old, when killed. Witness did not know what effect the slaying of a man would have upon the mind of the slayer. He once knew a man who received a severe blow on the head, and ever afterwards, during the thirteen years of his life, was insane at intervals. That man died insane.

Doctor J. T. Dickey testified, for the defense, that he saw defendant at or after five o'clock on the evening of July 4, 1885. Witness was called to dress his wound, which, in a measure, he succeeded in doing. Witness's opinion then was that the defendant was both insane and under the influence of whisky.

His opinion at present, being now familiar with the facts surrounding the case, was that defendant was then crazy. Witness remained with defendant thirty or more minutes on that occasion. Defendant was unconscious of what was transpiring, and was impressed with the conviction that the negroes were trying to kill kim, and called on persons present and absent to protect him.

Cross-examined, the witness testified that he applied a sticking plaster to the defendant's wound, but could not get it placed right, because of the defendant's struggles. The witness then, and now, thought that the defendant was insane, and that his insanity was the result of anger and excitement.

S. J. Willoughby testified, for the defense, that he saw the defendant in the town of Hutchings on the evening of July 4, 1885, first between two and three o'clock, on the base ball ground, and later, going from the black smith shop toward his horse. He had a knife or some such instrument in one hand, and was swinging his arms. He then mounted his horse, rode up to and shot the deceased, killing him. He then discharged his pistol three times more, and rode off towards the store. The defendant was crazy on that occasion. His actions were not those of a drunk man.

Cross-examined, witness said that he was engaged in the game of base ball. It began about two o'clock, and continued until about five; when the negro was killed. Defendant was on the ground when the game began, but witness did not know where he was during the time it was being played. Witness got a drink at the shop while the game was in progress, but was not at the shop again until after the killing. Witness did not see the defendant take but one drink on that day. While on his horse, after leaving the shop, the defendant said that a "G—d d—d negro had cut him, and that he would kill the negro." The witness did not think the drink of whisky caused the defendant's insanity. Just before the shooting, defendant's father asked him what was the matter with him. Defendant did not then reply, but immediately after the shooting said to his father: "That's what's the matter." Witness thought that defendant was totally crazy when he shot deceased, and unable to tell a negro from a white man.

L. E. Leggett testified, for the defense, that he was defendant's father. He lived near Hutchings on July 4, 1885. Defendant, who was nearly twenty-one years old, lived with witness. Witness went to Hutchings about one o'clock p. m. on July 4,

1885.   Defendant came to town some little time afterwards.   He tied his horse, and joined a crowd about the base ball ground. Witness and defendant worked together during the forenoon, and witness knew that defendant had taken nothing to drink up to the time he came to town.   Witness did not know how long defendant stayed on the play ground.   Witness next saw the defendant walking briskly from the black smith shop towards his horse.   He had a screw driver in his hand, flourishing it.   Witness saw as he passed that defendant's arm was bloody, and called three or four times to him to stop and tell him what was the matter, but defendant paid no attention to witness.   He went straight to his horse, cut the tie rope, mounted him, put one hand on the bridle, and with the other reached back and got his pistol.   Witness called to him for God's sake not to draw a pistol.   Defendant exclaimed that he was bleeding to death.   He then fired off his pistol, rode up to deceased, and shot him, with the remark: "You are the d—d son-of-a-b—h that cut me." Defendant then rode around shooting off his pistol.   Carl Frazier was a yellow, and deceased a black negro.   Witness knew James Glenn.   After he shot the deceased, defendant rode into Atwell's store, to which place witness followed him, and with the assistance of Reese Clinton, and others, took defendant from his horse, and out of doors.   The defendant resisted removal from his horse, fighting, struggling, and displaying extraordinary strength.   Ordinarily defendant was tractable and easily controlled by witness.   It was the opinion of the witness that the defendant was not drunk when he shot the deceased, but that he was crazy or possessed of the devil.

During the year 1880 the defendant was thrown by his horse over a bank, his head striking a large stone.   The result of that fall was a severe wound on the head, the scar of which was yet plain on the forehead.   Defendant was confined for several months with that wound, and for a long time afterwards complained of great pain in his head.   He suffered a severe attack of brain fever in 1881, which lasted three months, and six months elapsed before he was able to work.   Defendant had not been mentally sound since the attack of brain fever.   Doctor Potter attended defendant through that illness.   Defendant was readily excited, and, when laboring under excitement, knew absolutely nothing.   In the opinion of the witness, the defendant had not the least conception of what he did on the evening of the killing.   He did not recognize the witness after the tragedy.

Witness remained with the defendant after the killing until the sheriff took charge of him, at about eleven o'clock on the same night. Witness next saw him in jail, and asked him if he realized what he had done. He replied that he had no idea of his own, but that he had been told that he had killed a negro. Witness told him that he had actually killed the negro, and he replied that he supposed he would have to believe witness, but that he had no recollection of doing so.

Cross-examined, witness testified that he had no recollection of hearing defendant say, "that's what's the matter," after he shot the deceased. He would hardly forget such a remark if it was made, and would most certainly have heard it. Witness knew Robert Simpson, and regarded him an honest man. The witness had thought that defendant, since the injury to his head, was easily irritated, but had not fully decided in his own mind that, when excited and angry, he lost his reason, until the day of the killing. Witness had often told defendant that he would get into trouble unless he curbed his desperate and reckless habits. Defendant was rational and sane on the day of the killing up to the time that he went from the ball ground to the black smith shop. He had never exhibited an excitable or irritable temperament until after his fall from the horse in 1880. His excitability was aggravated by his subsequent attack of brain fever.

Doctor W. P. Stone testified, for the defense, that he saw the defendant at Atwell's store on the evening of July 4, 1885, after the killing. Two men were trying to hold him down. A blow on the head was capable of producing temporary, and sometimes produced permanent, insanity. Reaction, which invariably succeeds a non-fatal blow, often produces sick stomach and vomiting.

O. B. Clinton, the proprietor of the black smith shop, testified, for the defense, that his son, Reese Clinton, and the defendant, came to his shop about two o'clock on the evening of July 4, 1885. Defendant took but one drink of one swallow of whisky in that shop. The parties then in the shop were the witness, the defendant, Reese and Frank Clinton, John Campbell, Shorter, Eli Neal, and Frazier. The drink of whisky taken by the defendant was a mere taste, and had no apparent effect upon him. The colored man, Frazier, was an employe in witness's shop. He had just returned from Dallas, and wanted to go to sleep, as a means of resting himself for a dance to be given that night.

Defendant would not let him sleep, protesting that he should stay awake and play with the boys. Defendant was then playing with a screw driver. The negroes, Frazier and Neal, got into a political discussion, when some one called witness's attention to the fact that they were quarreling. As witness turned to look at them, he saw the defendant getting up from the ground, wild and furious. Frazier was standing near with the iron spoke of an engine in his hand. The spoke was about three and one-half inches wide, by one and a half inches thick. It was about two or two and a half feet long. Witness caught the defendant and tried to hold him, but failed. Defendant was utterly beside himself, and had not the faintest idea of what he was doing. The witness then knew that the defendant was subject to fits of insanity.

Cross-examined, the witness said that he took several drinks, but was not drunk on July 4, 1885. He got into his wagon, unaided, to go home that evening. No one put him into his wagon. Witness, Frazier, and Neal got into a discussion of the relations of the negroes to the soldiers of the federal army. Witness remarked to them that he, witness, and other federal soldiers, had liberated the negro race, and that the negroes for that reason ought to sustain the party of the federal soldiery at the polls. He remarked, further, that the Fifteenth Amendment to the federal Constitution, which guaranteed to the negro equal rights with the whites, was another result of the war fought for the negro by the federal soldiers. Defendant, who was witness's nephew, agreed with the witness. The trouble which culminated in the killing of the deceased began shortly after the talk about the soldiers and the negroes. Defendant left no one in his shop when he went off towards the ball ground, except witness, his son Frank, and Eli Neal. Frazier left the shop a few minutes before defendant did. Other parties were in and out of the shop during the evening.

Frank Clinton testified, for the defense, that the defendant came to witness's father's shop about two o'clock on the evening of July 4, 1885, and remained there until a few minutes before the killing occurred. All of the parties present took two drinks of whisky, save the witness and the defendant, who took one drink each. Defendant got to sporting with the negro Frazier, pretending an effort to unscrew his navel. Frazier was then lying down. He said that he wanted to sleep and rest, to be ready for a dance that night. Defendant made him get up and

join him and Neal in some sport.   Frazier and Neal then got into
a dispute as to which of the political parties was entitled to the
vote of the negroes.   Neal supported the claims of one party
and Frazier those of the other.   Witness's father and defendant
supported the right of the republican party to the negro vote,
upon the ground that it had freed the negro and invested him
with civil rights.   The debate between the negroes grew angry,
and Frazier presently struck at Neal with the spoke of an en-
gine, missed Neal, and struck defendant on the side of the head,
bringing him to his knees.   The defendant struck Frazier over
the head with a screw driver, and Frazier left the shop to get his
pistol, with which he said he was going to kill defendant.
Witness followed Frazier to his house, and prevented him from
getting his pistol.   All parties were drinking.   The defendant
was not drunk.

Cross-examined, witness testified that Neal owned the bottle
of whisky.   All parties drank out of Neal's bottle.   Witness was
not drunk.   Witness's father, Frazier, Neal, and the defendant
were together in the shop from about two o'clock until nearly
five.   Campbell, Shorter, Willoughby, and witness's brother,
Reese, were in the shop about the time the game of base ball
commenced, and they took a drink.   They went back to the
game and remained there until the killing occurred.   Neal, Fra-
zier, and witness's father were drunk while discussing the free-
dom of the negro.   The talk about the negro's rights occurred
just before defendant and Frazier struck one another, and just
before the shooting of the deceased.   Frazier struck defendant
over the left temple.   The blow bruised the side of his head con-
siderably.   Witness's father went home just after the shooting.
He was too drunk to get into the wagon.   Witness's mother and
uncle, the defendant's father, put him in the wagon.

A. B. Floyd testified, for the defense, that he had known the
defendant about ten years, and had seen a great deal of him dur-
ing the last four years.   Defendant's mind had not been right
since he had a severe attack of sickness about four years before
this trial.   The defense closed.

John Shorter testified, for the State, in rebuttal, that he, Wil-
loughby, and Campbell, on their way to the base ball ground,
about two o'clock on the evening of July 4, 1885, stopped at old
man Clinton's wood shop.   Defendant was in the shop at the
time.   All the parties named took a drink of whisky.   Witness
saw three bottles of whisky in the shop.   He did not see the de-

fendant take but one drink, but thought he had taken other drinks. Reese Clinton was not then at the shop, but was on the ball ground, and did not leave the ball ground nor go to the shop during the evening, prior to the shooting.

Robert Simpson testified, for the State, in rebuttal, that he had known the defendant between five and six years; lived near him, and saw him every week or two. So far as the witness knew the defendant had always been sane. Cross-examined, the witness said that he had never heard the question of the defendant's insanity mooted until the day of this trial.

S. J. Smith testified, for the State, in rebuttal, that during the spring pending this trial he met the defendant and two other young men on the road between Lisbon and Hutchings. Defendant was then drunk, and conducted himself like a drunken man.

Jeff Haskell testified, for the State, in rebuttal, that he and defendant ran stock for Mr. Gano for a couple of months during the summer preceding the trial, during which time they were together day and night. Judging from his conduct and his actions, the defendant was, during that time, as sane as any of witness's acquaintances. The killing of the deceased occurred soon after the defendant returned home from that drive. Henry Samuels and Jim Lewis, who were also with defendant on the cattle drive referred to by Haskell, testified substantially as did Haskell.

J. S. Rawlings recalled, testified, for the State, that, judging the defendant by his actions, he thought the defendant was drunk when he killed the deceased. Witness heard the defendant, after his arrest, exclaim: "G—d d—n the man who gave me the whisky!" Witness was unable to say that the defendant, when he fired the fatal shot, was or was not able to discern right from wrong. He heard defendant call to two or three persons by name after his arrest.

James Haigler testified, for the State, in rebuttal, that he was a deputy sheriff of Dallas county, and resided at Hutchings. He arrested defendant on the evening of, and after the killing. Defendant "gagged" and vomited several times, throwing up something like water. He slept about an hour at one time, and about an hour and a half at another time after his arrest. Cal Frazier was placed under arrest on that night. Witness and sheriff Smith examined defendant's head on that night, but could find no sign of a blow. Defendant, after waking up about

eleven o'clock, talked rationally. Cal Frazier, who was in arrest for an assault upon the defendant, was brought to the depot and confronted defendant. He asked defendant if it was true that they, Frazier and defendant, had had trouble. Defendant replied that they had had no trouble, and had only engaged in some sport.

Cross examined, witness stated that the defendant when arrested was "wild." It required the strength of two persons to arrest and hold him. He continued, long after his arrest, to call upon the boys who were out with him, to keep the Mexicans off of him, and not let them kill him.

O. B. Rawlings testified, for the State, in rebuttal, that he was in Hutchings on the day of the killing, and saw the defendant after his arrest. It was the opinion of the witness that the defendant was then drunk. Witness heard him curse the man who gave him the whisky.

Cross-examined, the witness testified that he judged defendant's condition only by his conduct and actions, and did not know of his own knowledge that defendant was drunk, or even drinking.

The State's witnesses Little and Bledsoe, basing their opinions upon the defendant's conduct at the time of the killing, were of opinion that the defendant was drunk.

Jailer Mack Sharp testified, for the State, that defendant had been in his custody since he was jailed, on July 4, 1885, during which time witness had seen him daily. Witness was not an expert, but if defendant, while in jail, was ever other than a sane man witness could not discover it.

L. E. Leggett, recalled for the defendant, testified that the defendant had had intervals of total insanity ever since his head was hurt in 1880.

The special charge refused by the trial court, to which reference is made in the second head note of this report, reads as follows:

"If you believe from the testimony that at the time of the killing, the defendant was in such a condition as not to know what he was doing, or to be able to distinguish right from wrong, and if you believe from the evidence that the defendant had not, prior to the killing, drank sufficient liquor to produce intoxication, and was afterwards, and before the killing, struck a blow upon the head, and that, except for this blow, the liquor taken would not have produced said condition, then you are in-

structed that this would not be voluntary intoxication, and the defendant would not be guilty."

The motion for new trial raised the question discussed in the opinion.

*Coombes & Gano*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. The exact facts surrounding the alleged homicide in this case will be found in the statement by the Reporters. But we will summarize them briefly here, for the better understanding of the opinion.

First. Appellant, in 1880, received a wound in the head caused by a fall from a horse. He was confined to the house for some months. After this he suffered from a long attack of typhoid fever, which, at the time at least, affected the brain.

Second. Subsequent to the wound and illness, his temperament seemed to undergo a change, and he became subject to fits of passion from inadequate cause; and the evidence tended to show that on more than one occasion he was actually insane.

Third. On the day of the homicide he appeared to be all right mentally and physically, through the morning and up to a short time before the homicide. At about two o'clock he went to a black smith's shop in the town of Hutchings, and there met several acquaintances; among them two colored men, Neal and Frazier. Some one at the shop had whisky, and the persons there, or some of them, had been drinking and continued to drink. Appellant was invited to join them, but he declined; on further persuasion he took, as some of the witnesses say, one drink of one swallow; other witnesses say they think he drank more, but none swore to seeing him drink more than once.

Fourth. Most of the parties at the black smith shop remained there for some length of time, at least an hour or two, and during that time the appellant was in apparent good humor, cheerful, and playful.

Fifth. After a length of time the two colored men, Neal and Frazier, got into a controversy in regard to whom gratitude of the negro was due because of their freedom. Appellant and one or more of the white men present, said it was due to the republican party. The two negroes who were at issue on the question

became angry, and Frazier struck at Neal with the spoke of an engine, the spoke being one and a half inches thick, three and a half inches wide, and two and a half feet long. The blow struck appellant on the side of the head (as two witnesses swore), and prostrated him to his knees. At the time he was struck he had a chisel or screw driver in his hand, and by some means was cut on the arm, and bled freely from it.

Sixth. When appellant arose from his knees he struck Frazier on the head with what ever it was he had in his hands, and Frazier passing out, appellant also struck the door with the instrument he held in his hand, and then passed out towards his horse. Frazier went out at the door, saying he would get his pistol and kill appellant.

Seventh. Appellant about the same time left the shop and went toward where his horse was tied, gesticulating with his arms and hallooing, but what was said was not stated, if understood.

Eighth. At the time there was a game of base ball being played a short distance from where the appellant's horse was tied, there being present the players and spectators, both white and colored.

Ninth. Appellant cut the cord with which his horse was tied, mounted him, reached down to the saddle pocket, secured his pistol, rode in a lope more or less about the play grounds, flourished his pistol, perhaps fired it off, at last came to the deceased, who was a spectator of the game, fired at him, shot him in the head, killing him instantly, saying as he shot: "That's the damned rascal that cut me." The deceased was an old black negro, and Frazier was a yellow man. The deceased had had nothing to do with the trouble which had occurred at the black smith shop.

Tenth. Appellant, after the shot, rode around firing off his pistol, drawing it on a white man, making him hold up his hands, and then rode to town and into a store house, still apparently wild with excitement, where he was unhorsed forcibly, it requiring two men to manage him, he manifesting exceptional and extraordinary strength. After he was unhorsed his wildness continued for a considerable period of time, but afterwards, from prostration or other causes, he slept, at one time an hour, and at another time one and a half hours, which brought the hour to eleven o'clock at night, the shooting having occurred at five o'clock p. m., when he was carried to the jail.

Eleventh. Persons acquainted with the appellant, who saw his actions just before, at the time of, and after the shooting, describe him as in their opinion insane. One physician, who saw his actions as above, and others who saw him after the shooting, all give it as their professional opinion that he was insane.

We have not undertaken to give all the testimony heard on the trial, for the reason that we do not deem it material to do so to reach our conclusions on the questions presented for our decision. There was evidence tending quite strongly to prove that appellant was drunk, and not insane, and there are some contradictions as to what occurred on the ground just prior to and after the shooting; but the view we take of the case renders it needless that we should discuss the sufficiency of the evidence to support the verdict, or whether the verdict is palpably against the preponderance of the evidence. There was no evidence showing that appellant knew the deceased. Our conclusions as to the law on the facts are as follows:

First. The court should have charged the law of manslaughter. The evidence plainly raised that question, and it should have been submitted to the jury. The fact that the deceased was not the man whose act provoked the sudden passion, if it existed, which could be weighed by the jury to reduce the homicide to manslaughter, is not an insuperable one to bar appellant from having that issue submitted by the court to the jury, for their consideration in determining the degree of crime and grade of punishment. The intent, at the time of the homicide, in the mind of the slayer, is the measure to be applied to ascertain the degree of crime.

We have formerly said, after very careful consideration: "If one committing an assault with intent to murder accidentally kill a third person, he is guilty of murder in the second degree (McConnell v. The State, 13 Texas Ct. App., 390), but if the act done is the unintentional homicide of a different person from the one intended, but without malice and while the mind is under the immediate influence of sudden passion, arising from an ade-' quate cause, such as anger, etc., rendering it incapable of cool reflection, the crime is manslaughter, because the one intended was manslaughter. The intent is the essence of the crime, and when the intent and act resulting from it are precisely the same, whether the fatal shot took effect upon the party at whom it was aimed, or some one else, the guilt, it would seem, would be the same." (Clark v. The State, 19 Texas Ct. App., 502–3.)

It will not be questioned that if the person killed had been the man Frazier, and not an innocent third party, a charge on manslaughter would not only have been applicable, but, under the law, an absolute requisite to a full, complete, and perfect charge, to respond to the facts in evidence. The matter of adequate cause, of cooling time, the killing in passion, and whether it flowed from the adequate cause are all facts for the jury, under the proper directions by the court as to the law of the case.

There was evidence tending to prove a blow on the head, a wound that drew blood, and blood enough drawn to make the person of the party bloody; also that there was excitement and passion, and that the killing followed in the track of the blow, the blood and the passion, within a brief period, and may have been attributed to the passion, but the person killed was not the person who aroused the passion, but another person who had no connection with the trouble. How does that change the question?

We have heretofore seen that *intent* is the essence of crime, and if appellant killed the deceased believing him to be Frazier, then he would be guilty of the identical crime of which he would have been guilty had he killed Frazier, unless the killing of Frazier would have been murder in the first degree, and then this killing would have been murder in the second degree. There would, indeed, have been other and many collateral but pertinent questions for the jury to consider, and among them, whether appellant was recklessly disregardful of human life; whether there was really a mistake as to the identity of persons, time for cooling, and whether passion existed; but these were all subordinate to the main question, viz: Was the killing done in sudden passion arising from an adequate cause? And the consideration of any and all of these main and collateral questions, by the jury, depended on the charge of the court. The law of manslaughter should have been given in charge by the court, whether requested by appellant or not. The facts themselves called for the charge.

Second. Insanity of the appellant at the time of the homicide was also relied on in defense. While the charge was very full on nearly all the points, yet, on another trial, we think an additional view of the law should be presented. The court failed to state to the jury what was the law of the case in the event they believed from the evidence that the blow and the drink combined caused the alleged state of insanity, but in such view

connected the blow and the liquor with a predisposing cause to insanity, notwithstanding one of the witnesses (Doctor Potter) testified that a "person in a normal condition of mind might take a drink or stimulant that would not affect the mind, and if struck on the head the mind might be instantly affected; a blow on the head without any stimulant whatever might produce insanity, but with a stimulant, a man would much more likely become insane from the blow.

The point made by appellant in the first charge asked was substantially correct, and should have been given. The correct doctrine applicable to the facts is believed to be as stated in Brown's Medical Jurisprudence (2 ed.), p. 370. There are other points made by appellant, but, as they will not probably arise on another trial, they will not be further noticed.

Because of the error in failing to charge the law of manslaughter, and refusing the charge as requested by appellant, the case is reversed, and cause remanded for a new trial.

*Reversed and remanded.*